Volume 1 of 2

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ROBERT CHARLES COMER,
            *Petitioner-Appellant,*

            v.

DORA B. SCHRIRO, Director, of
Arizona Department of
Corrections,
            *Respondent-Appellee.*

No. 98-99003

D.C. No.
CV-94-01469-ROS

OPINION

Appeal from the United States District Court
for the District of Arizona
Roslyn O. Silver, District Judge, Presiding

Submitted March 7, 2007*
San Francisco, California

Filed March 15, 2007

Before: Mary M. Schroeder, Chief Judge, Harry Pregerson,
Alex Kozinski, Pamela Ann Rymer, Andrew J. Kleinfeld,
Kim McLane Wardlaw, William A. Fletcher,
Raymond C. Fisher, Richard A. Paez, Richard C. Tallman,
Johnnie B. Rawlinson, Richard R. Clifton, Jay S. Bybee,
Milan D. Smith, Jr., and Sandra S. Ikuta, Circuit Judges.

*The En Banc Court finds this case suitable for decision without further
oral argument. *See* Circuit Advisory Committee Note to Ninth Circuit
Rules 35-1 to 35-3, Note 3 (after the en banc court is chosen, the judges
on the panel decide whether there will be oral argument).

Per Curiam Opinion;
Concurrence by Judge Paez;
Dissent by Judge Pregerson

**COUNSEL**

Denise I. Young, Tucson, Arizona; Julie S. Hall, Tucson, Arizona, for the petitioner-appellant.

Michael D. Kimerer, Phoenix, Arizona; Holly R. Gieszl, Phoenix, Arizona, special counsel for the petitioner-appellant.

John Pressley Todd, Assistant Attorney General, Phoenix, Arizona, for the respondent-appellee.

**OPINION**

PER CURIAM:

After appealing the District Court's denial of his 28 U.S.C. § 2254 petition, Petitioner Robert Comer ("Comer") moved pro se to waive further federal proceedings, to terminate representation by his habeas counsel, and for dismissal of his appeal. A three-judge panel of our court remanded for the District Court to determine (1) whether Comer is competent to waive further proceedings and (2) whether he has chosen to do so voluntarily. *See Comer v. Stewart*, 215 F.3d 910 (9th Cir. 2000). After extensive proceedings, the District Court found that Comer is competent and his decision to waive further proceedings voluntary. *See Comer v. Stewart*, 230 F. Supp. 2d 1016 (D. Ariz. 2002).

We review the District Court's finding that Comer is competent for clear error. *See Massie ex rel. Kroll v. Woodford*, 244 F.3d 1192, 1194 (9th Cir. 2001) (per curiam). We assume, without deciding, that we review de novo the District Court's determination that Comer's decision to waive further proceedings is voluntary.[1] Accordingly, we must now deter-

_____

[1]*Cf. Godinez v. Moran*, 509 U.S. 389, 400 (1993) ("In addition to determining whether a defendant who seeks to waive counsel is competent, a

mine (1) whether the District Court clearly erred in finding Comer competent to waive further proceedings and (2) whether Comer's decision to waive further proceedings is voluntary. Comer's waiver of proceedings has a long history which we briefly summarize below.

## A.  *Background*

### 1.  Comer's Waivers at Trial and Sentencing

Comer was charged with one count of first degree murder, three counts of armed robbery, two counts of aggravated assault, two counts of kidnaping, two counts of sexual abuse, and three counts of sexual assault. After Comer waived his presence at his 1988 trial, the jury found him guilty on all counts.

Comer also waived his presence at the April 8, 1988 mitigation/aggravation sentencing hearing where the parties presented evidence and argument regarding whether Comer should be sentenced to death or to life in prison.

Nor did Comer want to appear at the April 11, 1988 hearing for the pronouncement of his sentence.[2] Arizona state law,

---

trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary")*; Moran v. Godinez,* 57 F.3d 690, 698 (9th Cir. 1995), *amending* 40 F.3d 1567 (9th Cir. 1994) ("Whether a waiver of constitutional rights was made knowingly and voluntarily is a mixed question of law and fact which we review de novo"); *Crandell v. Bunnell*, 25 F.3d 754 (9th Cir. 1994) (per curiam) (reviewing de novo petitioner's claim that he did not voluntarily waive his right to counsel in state municipal proceedings); *United States v. Amano*, 229 F.3d 801, 803 (9th Cir. 2000) (reviewing *Miranda* waiver de novo).

[2]"There were no arguments to be heard or evidence to be taken" at the sentence imposition hearing; it "was the time for the [sentencing] Court's rendition of the special verdict, a copy of which was furnished to both counsel." *See* September 22, 1998 Arizona Superior Court Order at 3 (dismissing second state post-conviction petition); *see also* August 2, 1996

however, required that Comer be present when his sentence was pronounced. On the day of the pronouncement, Comer refused to voluntarily attend the hearing. He barricaded his cell door with a mattress and threatened jail staff with a 10-inch shank. Jail correctional officers, in order to disarm Comer and extract him from his cell, sprayed Comer with water from a fire-hose with a 150-pound water pressure capacity. Even when being sprayed with the fire hose, Comer still fought back.

A prison doctor, one day after the incident, testified that he was present at the jail on April 11, 1988 when Comer refused to come out of his cell. It was clear to the doctor that Comer was "willing and able" to do serious bodily harm to anyone who came within his reach. The doctor considered it a potentially lethal situation, to both Mr. Comer as well as any of the guards there, that was handled in a "very humane manner with no one getting hurt."[3] The District Court later concluded that Comer gave officers no choice but to remove Comer from his cell by force.

After finally disarming Comer, jail correctional officers brought Comer to the sentencing courtroom in a wheelchair, his head slumped to one side, apparently unclothed except for a blanket covering his lap, with a contusion on his forehead. At the trial court's request, a medical doctor checked Comer to see if Comer was conscious and aware. In the doctor's

District Court Order at 27 (rejecting argument that Comer's physical appearance at the April 11, 1988 imposition of sentence hearing could have affected Comer's sentence for the state trial court "had already determined the sentence based on the evidence presented at a prior aggravation/mitigation hearing").

[3] *See* August 2, 1996 District Court Order at 27; *see also* September 22, 1998 Arizona Superior Court Order at 3 (state trial court, in its order dismissing second state post-conviction petition as procedurally barred, noted that Comer "brought the whole situation on himself").

opinion, Comer was competent and conscious throughout all of the court proceedings on April 11, 1988.

The complete transcript of the April 11, 1988 pronouncement of sentence supports the doctor's opinion that Comer understood the proceedings.[4] Despite his physical appearance, Comer was responsive to the judge's questions. For example, when told by the prison doctor that he (Comer) was "in court in front of the Judge," Comer responded "I know." When the trial judge asked Comer, "I know you don't want to be here today, is that right?," Comer responded: "We made it though, huh?" When the Court replied "I guess we did but I'll tell you —," Comer interjected "With a little help from my friends, man." The trial court then explained to Comer:

> Arizona law requires that you have to be here at the time of sentencing and that is why you are here. [¶] I wish I could accommodate your wish not to be here but because the law says you have to be here. That is why they had to bring you up. Do you understand that?

Comer responded: "Yeah."

After the trial court read to Comer the counts of conviction, the trial court noted that Comer had already served 431 days in custody. When asked "Does that number of days sound right to you, Mr. Comer?," Comer replied: "Yeah." The trial court then asked Comer whether there was "anything you want to say now before I pronounce sentence?" Comer

---

[4]*See* 4/11/88 complete RT; *see also* September 22, 1998 Arizona Superior Court Order at 3 (state trial court, in its order dismissing second state post-conviction petition as procedurally barred, noted that on April 11, 1988 it had determined that Comer was conscious and aware of the proceedings and there was no issue as to Comer's competency); *see also* August 2, 1996 District Court Order at 27 (District Court found that "the record of the sentencing proceeding itself shows that [Comer] was competent").

responded: "Yeah. Are you going to sentence me for the piece, the tool?" The trial court replied "We are going to get into that later . . . ."

After Comer twice more stated he had nothing he wished to say before the pronouncement of his sentence, the trial court sentenced Comer to death for the murder and to aggravated, consecutive terms of imprisonment on the remaining counts, resulting in a sentence of imprisonment totaling 339 years.

### 2. Comer's Claims Regarding His Appearance at Sentencing, Raised For First Time in Federal Habeas Proceedings, Were Later Expressly Ruled Procedurally Barred By State Courts

In 1990, the Arizona Supreme Court affirmed Comer's convictions and sentences. In 1993, the Arizona Supreme Court denied Comer's petition for review of the trial court's 1992 denial of Comer's first state post-conviction petition. Neither on direct appeal nor in his first state post-conviction petition did Comer claim that his constitutional rights were violated because his sentence was pronounced when he was nearly naked and slumped in a wheelchair.

Comer raised his appearance at sentencing claims for the first time in his amended 28 U.S.C. § 2254 petition filed in 1995 in federal district court. Specifically, Comer argued that (1) sentencing him while he was unclothed and semi-conscious violated the Fourteenth Amendment by impairing his Eighth Amendment right to allocution and (2) sentencing him while he was unclothed violated the Fourteenth Amendment. The District Court ruled that Comer's appearance at sentencing claims were unexhausted and, after concluding that Comer's unexhausted claims were now procedurally pre-

cluded by state court rule, denied Comer's motion to hold his 2254 petition in abeyance pending exhaustion.[5]

When Comer later returned to state court and raised his appearance at sentencing claims in his second state post-conviction petition, the state trial court in 1998 dismissed the entire second state post-conviction petition as procedurally barred[6] and ruled specifically that Comer's appearance at sentencing claims were procedurally barred.[7] In 1999, the Arizona Supreme Court denied Comer's petition for review.[8]

## B.  *Analysis*

[1] If Comer is competent to waive further proceedings, then we need not, and indeed cannot, decide whether any of Comer's claims have merit or are procedurally barred because there is no dispute remaining between the parties. *See Gilmore v. Utah*, 429 U.S. 1012, 1016-17 (1976) (Burger, C.J., concurring) (once a competent petitioner waives further review, the court lacks jurisdiction to consider other issues no matter their merit); *see also Massie ex rel. Kroll*, 244 F.3d at 1194 (whether petitioner's "conviction and sentence meet federal constitutional standards is not now before us").

[2] Thus, the only questions before us now are (1) whether the District Court clearly erred in determining that Comer is competent, *see Massie ex rel. Kroll,* 244 F.3d at 1194, and (2)

---

[5]*See* August 2, 1996 District Court Order at 26, 55.

[6]In the penultimate sentence of its order dismissing the second state post-conviction petition, the state trial court added: "Further, no colorable claim has been presented, in that no material issue of law or fact exists which would entitle [Comer] to relief in these proceedings." *See* September 22, 1998 Arizona Superior Court Order at 10. A state court, however, does not vitiate a procedural bar ruling by addressing the merits of a claim in the alternative. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989).

[7]*See* September 22, 1998 Arizona Superior Court Order at 4-5, 10.

[8]*See* December 6, 1999 Arizona Supreme Court Order.

whether Comer's decision to waive further proceedings is voluntary.[9]

[3] The District Court, after extensive proceedings and a meticulous analysis, found Comer competent. *See Comer*, 230 F. Supp. 2d at 1034-63. Because no party before this Court, including habeas counsel, disputes Comer's competency, there is no issue before this Court as to Comer's competency.[10] *Cf. Gilmore*, 429 U.S. at 1016-17 (1976) (Burger, C.J., concurring) (federal courts have jurisdiction only over "cases and controversies" and lack jurisdiction over questions undisputed by the parties).

Habeas counsel argue instead that Comer's decision to waive further proceedings is involuntary and constitutionally invalid due to harsh prison conditions.[11] A waiver of constitutional rights is voluntary if, under the totality of the circumstances, it was the product of a free and deliberate choice rather than coercion or improper inducement.[12]

Habeas counsel quote passages from Comer's letters to counsel and insist that Comer's letters, in combination with

---

[9]As previously noted, we assume without deciding that we review the District Court's voluntariness determination de novo. *See supra* p. 3116 & note 1.

[10]*See* Habeas Counsel's November 22, 2006 Brief Re En Banc Review (filed under seal) at 45-60. We unseal the sealed pages cited in this opinion only to the extent that unsealing is necessary for purposes of this opinion. The sealed materials, including the specific pages cited herein, otherwise remain sealed.

[11]*See* Habeas Counsel's November 22, 2006 Brief Re En Banc Review (filed under seal) at 45-60*; cf. Comer*, 230 F. Supp. 2d at 1064-72.

[12]*Cf. United States v. Doe*, 155 F.3d 1070, 1074 (9th Cir. 1998) (*Miranda* waiver); *Whitmore v. Arkansas*, 495 U.S. 149, 165 (1990) ("That prerequisite for 'next friend' standing is not satisfied where an evidentiary hearing shows that the defendant has given a knowing, intelligent, and voluntary waiver of his right to proceed, and his access to court is otherwise unimpeded").

prison deprivations and harsh prison conditions, show that Comer's decision to waive further proceedings is involuntary.

Dr. Johnson, the independent psychiatric expert appointed by the District Court, toured the prison and interviewed Comer for numerous hours. In Comer's district court testimony, Comer agreed with Dr. Johnson's opinion that although prison conditions contributed to Comer's decision to waive further proceedings, the prison conditions were not the most significant factor nor were they so harsh as to cause him to abandon his natural desire to live. Comer acknowledged that he had been through tough times when in prison, yet he had "a hard time seeing that" prison conditions could make him do anything. The conditions were harsh, but Comer observed that when he stays out of trouble the conditions get "unharsh." Despite harsh prison conditions, Comer insists he is competent to "pull" his appeals and his decision to do so is voluntary.[13]

[4] As there is no dispute regarding Comer's competency, the District Court did not err in accepting Comer's testimony that prison conditions are not the major factor in his decision to waive further proceedings nor are they so harsh as to force him to abandon a natural desire to live.[14] *Cf. Dawson v. Mahoney*, 451 F.3d 550, 551-52 (9th Cir. 2006) (state court did not err in accepting competent capital petitioner's testimony regarding the effect of prison conditions on his decision to waive further proceedings over habeas counsel's arguments that petitioner's reactions to harsh prison conditions rendered his decision involuntary).

---

[13]*See* State's August 25, 2004 ER 2 at 478-79, 514, 524 (filed under seal) & State's August 25, 2004 ER 3 at 686-697, 712 (filed under seal).

[14]When the District Court determined that Comer's decision to waive further proceedings is a voluntary one, the District Court implicitly accepted Comer's testimony as sincere and credible. *See Comer*, 230 F. Supp. 2d at 1071.

**[5]** Because Comer is competent and has voluntarily decided to waive further proceedings, we grant his pro se motions to waive further proceedings, to terminate representation by habeas counsel, and for dismissal of his appeal.

**APPEAL DISMISSED.**

PAEZ, Circuit Judge, concurring:

Although I concur in the order dismissing this appeal, I write separately to emphasize that, as part and parcel of the evaluation of whether a petitioner's waiver is knowing and voluntary, the district court must ensure that the petitioner has an understanding of the viability of his legal claims, particularly if they have some likelihood of success. *See, e.g.*, *Godinez v. Moran*, 509 U.S. 389, 401 n.12 (1993) ("The purpose of the 'knowing and voluntary' inquiry . . . is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision."); *O'Rourke v. Endell*, 153 F.3d 560, 568 (8th Cir. 1998) (holding that a waiver was not "knowing and voluntary" because "[t]he court never explained to [petitioner] the significance of his decision to waive his postconviction appeal. No one questioned him as to his understanding of the possible results of a successful appeal, which might have included not only a lesser sentence but a new trial with a potentially different outcome.").

In the section of its ruling entitled, "Legal Position and Options Available and Rational Choices," the district court discussed whether Comer understood the claims raised in his habeas petition and their potential for success. *Comer v. Stewart*, 230 F. Supp. 2d 1016, 1061-63 (D. Ariz. 2002). The court recounted in detail how "Mr. Comer testified plainly and logically that he understands that the merits of his habeas appeal are legally strong . . . and he is aware that the Ninth Circuit

expressed concerns about his conviction and sentence." *Id.* at 1061. The court concluded that "Mr. Comer's testimony makes clear that he is aware that he may have a good chance for reversal of the death sentence and perhaps even the conviction," but that he wished to halt his legal challenges even so. *Id.* at 1062. The court further explained that it had initially been "naturally perplexed with and skeptical of Mr. Comer's decision" but was convinced after the hearing that "his decision is a rational one." *Id.* In light of the district court's thorough findings, including its finding that Comer understood his legal claims, the district court appropriately determined that Comer's decision to end his appeal was knowing and voluntary.

---

PREGERSON, Circuit Judge, dissenting:

I dissent for the reasons carefully and eloquently set forth in my brother Judge Warren Ferguson's majority opinion filed on September 13, 2006. See *Comer v. Schriro*, 463 F.3d 934 (9th Cir. 2006). That opinion, in which I wholeheartedly concurred, was withdrawn by the en banc court on December 29, 2006. *See Comer v. Stewart*, 471 F.3d 1359 (9th Cir. Dec 29, 2006). Judge Ferguson's opinion states in full:

FERGUSON, Circuit Judge:

Arizona death row prisoner, Robert Charles Comer ("Comer"), appealed the District Court's denial of his 28 U.S.C. § 2254 habeas petition challenging his conviction and capital sentence for first degree murder, armed robbery, kidnapping, aggravated assault, sexual assault, and sexual abuse. Before Comer's appeal could be heard, however, the State of Arizona (the "State") and Comer filed motions to dismiss the appeal because Comer expressed his desire to be executed. On remand from

this Court, the District Court held an evidentiary hearing and found Comer to have competently and voluntarily waived his habeas appeal right. Habeas Counsel now challenges that determination on appeal.

We agree with the District Court that Comer competently and voluntarily waived his habeas appeal right. By upholding Comer's waiver, however, we would be permitting the State to execute Comer without any meaningful appellate review of his previously filed federal habeas claims, which would amount to a violation of the Eighth Amendment to the U.S. Constitution. We therefore deny the State's and Comer's motions to dismiss the appeal and proceed to review the District Court's denial of Comer's federal habeas petition.

We hold that Comer's sentence was invalid and hereby grant the writ of habeas corpus based on the violation of Comer's due process rights that occurred when he was sentenced to death while nearly naked, bleeding, shackled, and exhausted.

## I.   FACTUAL AND PROCEDURAL BACKGROUND[1]

*Crime*

The facts of this case are deeply disturbing. Comer, his companion Juneva Willis ("Willis"), and Willis's two children arrived at the Burnt Corral campground in Apache Lake, Arizona on February 2, 1987. The next evening, Comer invited a nearby

---

[1]The facts related to Comer's crime, charges, and conviction are largely taken from the Supreme Court of Arizona's 1990 decision in this case. *See State v. Comer*, 799 P.2d 333, 336-38 (Ariz. 1990).

camper, Larry Pritchard, to dine with him and Willis, and, after the meal, Comer shot him in the head. It is unclear whether Pritchard died immediately from the gunshot wound or later on. Comer later stabbed him in the neck. Comer then removed an Emergency Medical Technician ("EMT") badge from Pritchard's pocket, and Willis hid Pritchard's body by covering it with wood. After the murder, Comer and Willis drove to Pritchard's campsite, where they stole a number of Pritchard's belongings, as well as his dog.

Comer and Willis then proceeded to the campsite of Jane Jones and Richard Smith, campers whom they had met earlier that day. Remembering from their earlier encounter that Jones and Smith were in possession of a small quantity of marijuana, Comer and Willis posed as "Arizona Drug Enforcement" officers, and ordered them out of their tent at gunpoint. Comer flashed the EMT badge and then tied up Jones and Smith with wire and duct tape. He put them in their truck and stole several items from their tent.

Comer then drove Jones's and Smith's truck, while Willis followed behind in his. After a short time, Willis stopped following Comer. When Jones asked to relieve herself, Comer permitted her to do so but accompanied her into the woods and sexually assaulted her. He then sexually assaulted her again in front of the truck. Comer threatened to kill Smith but Jones convinced him not to do so. Comer instead left Smith in the woods and drove off with Jones. When the truck ran out of gas, Comer and Jones walked back to Willis, and the three of them then drove together, along with Willis's two children. During this journey, Comer shot and killed Pritchard's dog, and sexually abused Jones twice more.

Jones managed to escape while Comer was fixing his truck. She was later picked up by a passing motorist and taken to the sheriff's home. Smith, too, had managed to walk back to the Burnt Corral campground and had reported the incident to the Department of Public Safety. The police quickly apprehended Comer and Willis.

*Charges*

Comer and Willis were charged in Maricopa County with the first degree murder and armed robbery of Pritchard and the armed robbery, kidnapping, and aggravated assault of Jones and Smith. In addition, Comer was charged with two counts of sexual abuse and three counts of sexual assault of Jones. Willis subsequently pled guilty to one count of kidnapping in exchange for agreeing to testify against Comer. The other charges against her were dropped.

*Convictions and Sentence*

Comer was absent from the courtroom throughout his 1988 state trial for capital murder. After seven days of hearing evidence, a jury found Comer guilty on all counts.

Comer was physically present in the courtroom for the first time on the day of his sentencing. He was shackled to a wheelchair and, except for a cloth draped over his genitals, he was naked. His body was slumped to one side and his head drooped toward his shoulder. He had visible abrasions on his body. After asking both the court deputy and a prison psychiatrist whether Comer was conscious, the state trial judge sentenced him to death for the murder of Pritchard and to aggravated, consecutive terms of imprisonment for the other offenses.

On direct appeal, the Arizona Supreme Court affirmed the convictions and sentence. *Comer*, 799 P.2d at 350.

*State Post-Conviction Relief*

On October 24, 1991, Comer filed a petition for post-conviction relief in state court challenging the constitutionality of his conviction and sentence. On November 10, 1992, the superior court denied the petition on the ground that Comer's claims were largely precluded and waived. The Arizona Supreme Court denied the petition for review on September 21, 1993, and the U.S. Supreme Court denied the petition for certiorari on April 4, 1994.

*Federal Habeas Corpus Petition*

On July 19, 1994, Comer filed a federal habeas corpus petition with the District Court of Arizona. He later filed an amended petition on March 16, 1995.[2] On August 2, 1996, the District Court found that Comer had procedurally defaulted on all his habeas claims except Claims I, II, III(A), III(B)(1), III(C) (in part), V(A), V(B), XIII, XX(C)(4), and XX(D), which largely concerned errors at trial and ineffective assistance of defense counsel.[3] The District

---

[2] While Comer's habeas petition was pending, he filed a second petition for state post-conviction relief in state court challenging the constitutionality of his conviction and sentence. On September 22, 1998, the state trial court denied the petition on the ground that Comer's claims were procedurally precluded, and on December 6, 1999, the Arizona Supreme Court denied review.

[3] Specifically, these claims were: (1) the trial court's failure and refusal to sever counts (Claims I and II), (2) the prosecutor's misconduct in repeating the use of dehumanizing epithets to characterize Comer (Claim III(A)), (3) the prosecutor's misconduct in using invective during closing argument (Claim III(B)(1)), (4) the prosecutor's misrepresentation of law

Court considered the merits of these claims and, on November 20, 1997, denied Comer's habeas petition.

*Appeal to this Court*

On February 18, 1998, Comer filed a timely notice of appeal to the Ninth Circuit challenging the District Court's denial of his habeas petition. This Court has jurisdiction to hear Comer's appeal pursuant to 28 U.S.C. § 2253.

*Intervening Motion to Dismiss Appeal*

After filing his appeal, Comer sent letters to the State Attorney General and to the state trial judge stating that he no longer wanted his appeal to be heard and expressing his desire to die. In light of these letters, the State moved to dismiss Comer's appeal contending that this Court lacked jurisdiction to determine any aspect of the case. Comer himself also filed a pro se motion to dismiss his appeal. Comer's originally appointed counsel — now Habeas Counsel — opposed both the State's and Comer's motions and asked this Court to order a procedure to determine the validity of Comer's appeal. On September 18, 2000, the District Court appointed Special Counsel to represent Comer con-

---

and facts during closing argument (Claim III(C)), (5) the trial court's failure to strike two jurors for cause (Claim V(A)), (6) the trial court's error in impairing Comer's exercise of peremptory challenges (Claim V(B)), (7) the Arizona Supreme Court's finding of "helplessness of the victim" as an aggravating factor for sentencing (Claim XIII), (8) defense counsel's failure to undertake an adequate mitigation investigation (Claim XX(C)(4)), and (9) appellate counsel's failure to raise on appeal any issue raised in Comer's habeas petition (Claim XX(D)).

cerning his decision to end his appeals and proceed to execution.

*Evidentiary Hearing*

This Court subsequently decided to vacate the date for oral argument on the merits of Comer's appeal and held the motion to dismiss Comer's appeal in abeyance until the District Court held an evidentiary hearing on the separate questions of whether Comer was competent to terminate representation by counsel and waive legal review and, if so, whether his conditions of confinement rendered those decisions voluntary. *Comer v. Stewart*, 215 F.3d 910 (9th Cir. 2000).

Pursuant to our order, the District Court conducted an evidentiary hearing in March 2002. Following extensive discovery and a three-day hearing, the District Court found in a 90-page opinion that Comer was competent to waive his habeas appeal right and that his waiver was made voluntarily. Habeas Counsel appealed the District Court's judgment to this Court. We delayed issuing a briefing schedule until the Supreme Court decided *Schriro v. Summerlin*, 542 U.S. 348 (2004) (holding that *Ring v. Arizona*, 536 U.S. 584 (2002), did not apply retroactively to cases already final on direct review).

## II.   DISCUSSION

### A.   *The Waiver's Validity*

#### 1.   *Background*

We asked the District Court to hold an evidentiary hearing to determine whether Comer competently waived his habeas appeal right. Pursuant to our

order, the District Court suggested to both parties that a neutral expert evaluator be appointed to assess Comer's competency at the time he waived his habeas appeal right, and that the parties confer and suggest candidates. The District Court allowed both parties to have access to every place Comer had lived while incarcerated. The parties submitted proposed findings of fact and conclusions of law, and both parties were allowed to object to each other's proposed findings and conclusions. The District Court thus ostensibly undertook comprehensive steps to ensure an adequate factual determination of Comer's competency at the time he waived his habeas appeal right.

The question before the District Court was whether, giving full and fair consideration to all of the evidence, it could be established by a preponderance of the evidence that Comer is competent to waive further legal review of his convictions and sentences. Specifically, we directed the District Court to determine "whether [Comer] has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." *Comer*, 215 F.3d at 917 (quoting *Rees v. Peyton*, 384 U.S. 312, 314 (1966) (per curiam)).[4] In arriving at

---

[4] As the District Court noted, the three-part *Rees* test to determine the capacity of an inmate to make a waiver decision has been simplified as follows by the Fifth Circuit in *Rumbaugh v. Procunier*, 753 F.2d 395, 398-99 (5th Cir. 1985):

(1) Is the person suffering from a mental disease or defect?

(2)   If the person is suffering from a mental disease or defect, does that disease or defect prevent him from understanding his legal position and the options available to him?

this determination, the District Court reviewed eval-
uations, reports, testimony from two psychiatrists
and one psychologist, Comer's personal background,
and other witness testimony and exhibits to conclude
that Comer did not suffer from mental disease or
defect. *See Comer*, 230 F. Supp. 2d at 1061.

### 2.   *Analysis*

### a.   *Competency*

The District Court's determination as to whether
Comer was competent to waive his habeas appeal
right is a strictly factual one that we accept unless
clearly erroneous. *Massie ex rel. Kroll v. Woodford*,
244 F.3d 1192, 1194 (9th Cir. 2001) (citing *Demos-
thenes v. Baal*, 495 U.S. 731, 735 (1990)). The Dis-
trict    Court    rendered    several    preliminary
determinations to come to its conclusion that Comer
was competent when he waived his habeas appeal
right. We analyze each preliminary determination

---

(3)   If the person is suffering from a mental disease or defect
which does not prevent him from understanding his legal position
and the options available to him, does the disease or defect, nev-
ertheless, prevent him from making a rational choice among his
options?

If the answer to the first question is no, the court need go no
further, the person is competent. If both the first and second ques-
tions are answered in the affirmative, the person is incompetent
and the third question need not be addressed. If the first question
is answered yes and the second question is answered no, the third
question is determinative; if yes, the person is incompetent, and
if no, the person is competent.

*Comer*, 230 F. Supp. 2d 1016, 1036-37 (quoting *Rumbaugh*, 753 F.2d at
398-99); *accord Lonchar v. Zant*, 978 F.2d 637, 641-42 (11th Cir. 1992);
*Ford v. Haley*, 195 F.3d 603, 615 (11th Cir. 1999).

here briefly to assess whether or not it was clearly erroneous.

First, the District Court determined that its own court-appointed expert, Dr. Sally Johnson, was significantly more qualified to render a competency opinion than Habeas Counsel's expert, Dr. Terry Krupers. *Comer*, 230 F. Supp. 2d at 1039. The Court based this determination on evidence as to the experts' qualifications, in particular on the fact that, unlike Dr. Johnson, Dr. Krupers had never engaged in a forensic evaluation to determine the competency of an inmate to be executed nor previously conducted a forensic evaluation of an inmate sentenced to death who wanted to dismiss his appeal. *Id.* Moreover, the Court found Dr. Johnson's investigation to be thorough and her questions especially relevant. *Id.* at 1040. Given the clear difference in expert qualifications between Dr. Johnson and Dr. Krupers, as well as Dr. Johnson's relatively superior investigation, the Court did not clearly err in affording greater weight to Dr. Johnson's opinions.

Second, the District Court determined that Comer did not suffer from Major Depressive Disorder. The Court based this determination on the accuracy of Dr. Johnson's differential diagnoses of Comer's various apparent depressive episodes. Specifically, with respect to Comer's first apparent depressive episode in May 1999, the Court found as credible Dr. Johnson's attempt to distinguish the differential diagnosis of bereavement from the symptoms that Dr. Krupers attributed to a major depressive episode. *See id.* at 1042-43. With respect to Comer's second apparent depressive episode in Spring 2001, the Court found as credible Dr. Johnson's attempt to distinguish the differential diagnosis of a general medical condition from the symptoms that Dr. Krupers attributed to a

second major depressive episode. *See id.* at 1043-44. Finally, with respect to Comer's apparent bouts of depression between his two purported episodes, the Court found as credible Dr. Johnson's explanation that Comer sought attention by narrating his feelings and that he did not deny his symptoms of depression, as Dr. Krupers had argued. *See id.* at 1047-48. Given the failure of Dr. Krupers to assess possible differential diagnoses for Comer's apparent depressive episodes, and the confidence with which Dr. Johnson attested to such diagnoses, the District Court did not clearly err in concluding that Comer did not suffer from Major Depressive Disorder.

Third, the District Court determined that Comer did not suffer from Post-Traumatic Stress Disorder ("PTSD"). The Court based this determination on Dr. Krupers's inability to apply accurately the DSM-IV criteria for PTSD.[5] In particular, the Court questioned Dr. Krupers's failure to identify credible evidence with respect to the third group of PTSD symptoms related to "increased arousal." *Id.* at 1052. According to the Court, Dr. Krupers needed to establish with sufficient certainty that Comer suffered from two or more of the following symptoms related to "increased arousal": (1) difficulty falling or stay-

---

[5]The District Court noted that

[a]part from some traumatic experience, the DSM-IV describes three groups of symptoms for PTSD, and one or more of each group must be suffered by the patient to establish a diagnosis of PTSD. The first group of symptoms is that the patient is 'persistently reexperienc[ing]' the traumatic event in at least one of various specific ways[, including recurring or severe] 'flashbacks' and 'nightmares' . . . . The second group of symptoms . . . require that a patient '[p]ersistent[ly] avoid[s] stimuli associated with the trauma.' . . . [The third group of] symptoms [requires] that the person experiences 'increased arousal' not present before trauma.

*Comer*, 230 F. Supp. 2d at 1051-52 (citations omitted)

ing asleep; (2) irritability or outbursts of anger; (3) difficulty concentrating; (4) hypervigilance; and (5) exaggerated startle response. *Id.* Dr. Krupers, however, merely speculated that "most prisoners in [Comer's] situation" would have difficulty falling asleep and failed to rebut Dr. Johnson's and Comer's testimony as to factors (4) and (5). *Id.* While it is unclear from the Court's opinion just how narrowly the DSM-IV criteria for PTSD are defined, the District Court did not clearly err in dismissing as unspecific Dr. Krupers's factual applications of the criteria to Comer's symptoms.

Lastly, the District Court determined that Comer did not suffer from Segregated Housing Unit ("SHU") syndrome. The Court based this determination on Dr. Johnson's and Comer's testimony contradicting Dr. Krupers's findings concerning SHU syndrome. *Id.* at 1057. The Court identified and accepted the following characteristic symptoms of SHU syndrome: massive free-floating anxiety, hyperresponsiveness, derealization, difficulty with concentration and memory, acute confusional states, ideas of reference and persecutory idealation (paranoia), and compulsion. *Id.* at 1056. The Court then affirmed Dr. Johnson's findings that Comer did not exhibit these symptoms at all or at least not to the level necessary to make an adequate showing of SHU. *See id.* at 1057.

Of particular importance to the District Court was Dr. Johnson's prior work with patients in segregated housing units and the fact that Comer's own testimony did not corroborate Dr. Krupers's findings. *Id.* Even though Dr. Krupers was qualified to offer his opinion on the disorder, he did not have prior experience in diagnosing or treating inmates who suffered

from SHU syndrome in the way that Dr. Johnson had.[6] While this fact alone does not render Dr. Johnson's findings more accurate than Dr. Krupers's, it does make it more difficult to find the Court's determination that Comer did not have SHU syndrome to be clearly erroneous, particularly since there are no rigorous DSM-IV criteria for diagnosing SHU syndrome. *See id.* at 1055.

In sum, the District Court's preliminary determinations are not clearly erroneous, demonstrating that the Court did not clearly err in determining that Comer competently waived his habeas appeal right.

### b.    *Voluntariness*

We review de novo the District Court's determination that Comer voluntarily waived his habeas appeal right. *See United States v. Amano*, 229 F.3d 801, 803 (9th Cir. 2000).

We directed the District Court to determine "whether [Comer's] purported decision [to waive further legal review] is voluntary" and "whether [Comer's] conditions of confinement constitute punishment so harsh that he has been forced to abandon a natural desire to live." *Comer*, 215 F.3d at 917. The District Court determined that Comer's waiver was voluntary and that the conditions of his confinement "have not had a substantial effect nor have they rendered his decision involuntary." *Comer*, 230 F. Supp. 2d at 1071.

We previously summarized the legal standard to determine voluntariness of waiver:

---

[6]Cross-examination of Dr. Krupers included the following exchange: "Q: Doctor, do you treat inmates in prison who suffer from what you term SHU syndrome? A: No, I don't."

The Supreme Court has held that a waiver of a petitioner's "right to proceed" is not valid unless, among other factors, it is "knowing, intelligent, *and voluntary.*" *Whitmore v. Arkansas*, 495 U.S. 149, 165 (1990) (emphasis added). "A waiver is voluntary if, under the totality of circumstances, [it] was the product of a free and deliberate choice rather than coercion or improper inducement." *United States v. Doe*, 155 F.3d 1070, 1074 (9th Cir. 1998). Put differently, a decision is involuntary if it stems from coercion — either mental or physical. *See, e.g., Brady v. United States*, 397 U.S. 742, 754 (1970). Indeed, courts have recognized that a decision to waive the right to pursue legal remedies is involuntary if it results from duress, including conditions of confinement. *See, e.g., Smith v. Armontrout*, 812 F.2d 1050, 1058-59 (8th Cir. 1987) (reviewing for error the district court's determination on whether petitioner's particular conditions of confinement rendered his decision to waive appeals involuntary); . . . *Grossclose ex rel. Harries v. Dutton*, 594 F. Supp. 949, 961 (M.D. Tenn. 1984) ("In the judgment of this Court, the conditions of confinement inflicted on Mr. Harries are so adverse that they have caused him to waive his post-conviction remedies involuntarily").

*Comer*, 215 F.3d at 917-18.

From the record, it is clear that Comer's waiver was a "product of a free and deliberate choice." *Doe*, 155 F.3d at 1074. At the evidentiary hearing, Comer clearly expressed his willingness to withdraw his

appeal in spite of the fact that Habeas Counsel informed him that his appeal had a strong prospect of success ("Julie [Hall] came down and said I had some real good merits in my case and that we were in the Ninth Circuit."). Special Counsel fully informed Comer that he could possibly receive a new sentence or a new trial, or even be found not guilty, if his appeal were to be heard.[7] Special Counsel further informed Comer that it would be much tougher for the State to retry him because of the amount of delay in the proceedings.[8] Moreover, Spe-

---

[7] [Special Counsel]: You've heard and we've talked a lot about what could happen if your habeas is considered by the appellate courts. And I think you have said that you believe, from everything you've been told and everything that you've read, that you have a good — good prospects for a new sentencing. Right?

[Comer]: Yes, ma'am.

[Special Counsel]: So that would mean — if you got a new — another sentencing, do you understand, then, that you may not get the death penalty?

[Comer]: Yes, ma'am.

[Special Counsel]: And you may even get a new trial.

[Comer]: Yes.

[Special Counsel]: You could — you could have a not guilty verdict in your favor and you'd be out on the street, right?

[Comer]: No.

[Special Counsel]: Why not?

[Comer]: I wouldn't put all the people through another trial. I'd just go up there, plead guilty. . . . There's no sense to it. That's what I mean. I've already been lawfully convicted.

[8] [Special Counsel]: You understand that if the government were to try this case 13 years later or by the time this decision is made, habeas decision is made, and if it was made in your favor, that there would be enormous amount of delay in the proceedings before they tried you?

[Comer]: It could be, yes, ma'am.

cial Counsel informed Comer that he would not be able to change his mind once he waived his habeas appeal ("[Special Counsel]: Do you understand that if you are allowed to drop your appeal that you may not be allowed to reinstate it afterwards if you change your mind? [Comer]: Yes, sir"). Perhaps most significantly, the District Court itself made clear to Comer that his decision to waive his appeal was his own and would necessarily result in his death.[9]

---

[Special Counsel]: And you understand that memories fade over that long period of time and the government —

[Comer]: Yes, ma'am.

[Special Counsel]: — it's often much harder for the government to prove their case.

[Comer]: Yes, ma'am.

[Special Counsel]: — the second time? And that evidence could be destroyed and witnesses could disappear or could die?

[Comer]: Yes.

[Special Counsel]: And those witnesses who were vital in your trial — and you remember your trial.

[Comer]: Yes.

[Special Counsel]: — may not be around.

[Comer]: That's quite possible.

[9] [District Court]: And do you also understand that the decision that you [Comer] have made and you have asked this Court to carry out, at least at my level, is the one — one decision which is most fundamental to all human beings, and that's to end your life.

[Comer]: Yes, ma'am.

[District Court]: You understand that?

[Comer]: Yes, ma'am, I do.

[District Court]: At least that's considered to be the most fundamental decision that anyone can make in this country. You understand that?

Despite all this, Comer repeatedly stressed how he understood the significance and consequences of withdrawing his appeal, and nevertheless wanted to do so. *See, e.g.*, ("I, in my heart, have not appealed [the denial of my habeas petition]. I never appealed any of this.").

From the record, it is also clear that Comer's waiver was not "improper[ly] induced" based on the conditions of his confinement. *Doe*, 155 F.3d at 1074. First, Comer's own violent actions in prison have contributed to his continued confinement in restrictive conditions. Both Dr. Johnson's and Dr. Krupers's clinical evaluations make this apparent. Dr. Johnson reports:

> Review of Mr. Comer's behavioral infractions (incident reports) over the last 13 years shows numerous major and minor violations. He had approximately a dozen violations for possession and manufacture of a weapon. In almost all cases this involved the making of shanks or knives. On at least two occasions he set fires in his cell . . . . He had several violations for destruction of property or tampering with equipment . . .. On one occasion he was involved in an actual attempted assault on another individual (another inmate).

---

[Comer]: Yes, ma'am.

[District Court]: And it's embodied in the Constitution. You find it throughout the Constitution. And we all have an obligation to ensure that nobody does that unless they have fully understood the consequences. You understand?

[Comer]: Yes, ma'am.

[Comer] has gradually, as the result of his behavior, developed a reputation within the Arizona DOC as being their highest security risk and most dangerous inmate. His intermittent manufacture of weapons and periodic impulsive verbal responses that are perceived as threatening, make it unlikely that he would succeed in changing the perception of the DOC about his degree of dangerousness in the foreseeable future. He personally verbalizes his own opinion that the extra security precautions are warranted in his case and takes some enjoyment in persistently attempting to succeed in circumventing security interventions made by the DOC.

Dr. Krupers reports:

Mr. Comer feels compelled, as a symptom of his mental disorder, to continually manufacture [metal] shanks; his doing so gives the DOC a rationale for requiring he live in ever more restrictive conditions; and the extremity of his conditions of confinement in turn exacerbate the mental disorder that is reflected (in part) in the compulsion to manufacture shanks . . . . [Comer's] psychologically compelled behaviors, to wit shank-manufacturing and threatening staff, prevent him from gaining even modest improvements in his actual conditions of confinement.

Based on Comer's own willful and violent actions, it is difficult to see how the State acted improperly in placing him in maximum confinement and, more

importantly, how his conditions of confinement have improperly coerced him into waiving his appeal.

Second, the conditions of Comer's confinement in the Arizona Department of Corrections (ADOC) Special Management Unit (SMU) II, while certainly harsh, are no more restrictive than the conditions of his confinement in SMU I and California's Folsom Prison,[10] nor are they unique to Comer. Comer himself estimates that his one-person prison cell in SMU II is twice as large as his two-person cell in Folsom ("[I]f you took my cell right now and cut it in half, it would still be bigger than our cells at Folsom, and at Folsom we had two people sitting in there"). He further notes that SMU II is more clean, easier to see in and out of, quieter, and less dangerous than Folsom or SMU I. SMU II is "heaven" compared to "Folsom" with "much nicer . . . conditions of confinement."[11] Comer references how other inmates were confined in "supermax units" at SMU II and how they posed equally as high a security risk as Comer. He defines his conditions of confinement in the context of what he and his fellow inmate, Robert Wayne Vickers ("Bonzai"), had coming to them ("You had me and Robert Wayne Vickers, Bonzai. We earned everything we got there [at SMU II], man, that's how we got there").

---

[10]Comer was incarcerated in Folsom from 1979-1984 and in SMU I from 1988-1996. He has remained in SMU II from 1996 until the present.

[11][Comer]: "Yeah. I mean, [SMU II] is still not paradise, but god, you start comparing to Folsom — you compare it just to SMU I there's a big different [sic]. But SMU I was never anywhere close to being what Folsom was . . . . But we're talking what, 23 years ago was Folsom. We're talking SMU I was 15 years ago. And then we're talking SMU II, that's — I've been here at SMU II that's what, six or seven years. And hell, I could tell you differences just two years ago — how much conditions have changed in our prison for all of us over there. It's gotten better just from two years ago. Not a big major change, like a big major change between Folsom and today, but you can still see it."

Thus, because Comer's waiver was "the product of a free and deliberate choice rather than coercion or improper inducement," *Doe*, 155 F.3d at 1074, the District Court did not err in determining that Comer voluntarily waived his habeas appeal right.

## B. The Waiver's Constitutionality

A capital defendant's waiver of appeal requires particularly careful scrutiny. Generally, "[w]e lack jurisdiction to entertain appeals where there was a valid and enforceable waiver of the right to appeal." *United States v. Jeronimo*, 398 F.3d 1149, 1152-53 (9th Cir. 2005). However, "because there is a qualitative difference between death and any other permissible form of punishment, 'there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.' " *Zant v. Stephens*, 462 U.S. 862, 884-85 (1983) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)). "By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons." *Roper v. Simmons*, 543 U.S. 551, 560 (2005).

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor *cruel and unusual punishments inflicted.*" U.S. Const. amend. VIII (emphasis added). Its protections apply to the states through the Fourteenth Amendment. *Furman v. Georgia*, 408 U.S. 238, 239-40 (1972). "[T]he death penalty has been treated differently from all other punishments" insofar as it cannot be "imposed without the serious and calm reflection that ought to proceed any decision of such gravity and finality." *Thompson v. Oklahoma*, 487 U.S. 815, 856 (1988) (O'Connor, J., concurring). For a death

sentence to be constitutional, the Eighth Amendment requires that the sentence be imposed in a non-arbitrary fashion. *See Gregg v. Georgia*, 428 U.S. 153, 188, 189 (1976).

Permitting a state to execute a capital defendant without a full adjudication of his previously filed federal habeas appeal amounts to an Eighth Amendment violation. The "[Supreme] Court has repeatedly emphasized that meaningful appellate review of death sentences promotes reliability and consistency." *Clemons v. Mississippi*, 494 U.S. 738, 749 (1990). Meaningful appellate review clearly includes review on direct appeal. *See Barefoot v. Estelle*, 463 U.S. 880, 887 (1983) ("[D]irect appeal is the primary avenue for review of a conviction or sentence, and death penalty cases are no exception."). But "significant evidence . . . demonstrates that the meaningful appellate review necessary in a capital case extends beyond the direct appellate process." *Murray v. Giarratano*, 492 U.S. 1, 24 (1989) (Stevens, J., dissenting).

Especially vital is meaningful appellate review of a capital defendant's habeas petition. "The writ of habeas corpus is the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action." *Harris v. Nelson*, 394 U.S. 286, 290-91 (1969). The writ demonstrates "Congress' expressed interest in providing a federal forum for the vindication of the constitutional rights of state prisoners." *Reed v. Ross*, 468 U.S. 1, 10 (1984). Habeas corpus is "not a 'static, narrow, formalistic remedy,' but one which must retain the 'ability to cut through barriers of form and procedural mazes.' " *Murray v. Carrier*, 477 U.S. 478, 501 (1986) (Stevens, J., concurring) (citation omitted). Its "central concern" is "fundamental fairness."

*Strickland v. Washington*, 466 U.S. 668, 697 (1984). Indeed, of the 599 federal habeas petitions submitted from 1973 to 1995 challenging the constitutionality of death sentences, 237 of them were granted, or nearly 40%. James Liebman, A BROKEN SYSTEM: ERROR RATES IN CAPITAL CASES, 1973-1995, E-5 (1995). Between 1976 and 1983, approximately 70% of capital defendants who had been denied federal habeas relief in district court prevailed in federal courts of appeal. *Whitmore*, 495 U.S. at 170-71 (Marshall, J., dissenting). Habeas review, therefore, significantly increases the reliability of a death sentence.

In contrast, allowing a defendant to arbitrarily waive such review, once it has been properly initiated by the defendant and the reviewing court has been presented with briefs that demonstrate the defendant's conviction or sentence may indeed be unconstitutional, violates the Eighth Amendment. The defendant is not taking his own life, he is coopting the power of the state's capital punishment system to kill — a power that must only be wielded in accordance with the Constitution's fundamental protections. The people's interest in justice, which forms the basis of the state's power to execute, should not be so easily commandeered. The right to die is not synonymous with the right to kill.

Comer once felt strongly about his federal habeas claims. His own attorneys — then habeas counsel — filed briefs that alerted this panel to potentially serious constitutional violations that occurred during Comer's trial and sentencing proceedings. To pretend these claims have gone away is to permit the state to execute a man who has been sentenced wrongfully.[12] The state should not be able to execute an

---

[12]*See* Section II.C., *infra*, "Comer's Habeas Claims."

illegally convicted or sentenced person. As the Pennsylvania Supreme Court so eloquently counseled:

> [W]hile a defendant may normally make an informed and voluntary waiver of rights personal to himself, his freedom to do so must give way where a substantial public policy is involved; in such a case an appeals court may feel fully warranted in seeking to reach an issue. . . . Because imposition of the death penalty is irrevocable in its finality, it is imperative that the standards by which that sentence is fixed be constitutionally beyond reproach. . . . [T]he waiver concept was never intended as a means of allowing a criminal defendant to choose his own sentence.

*Commonwealth v. McKenna*, 383 A.2d 174, 181 (Pa. 1978) (internal citations omitted).[13]

To allow a defendant to choose his own sentence introduces unconscionable arbitrariness into the capital punishment system. *See Massie v. Sumner*, 624 F.2d 72, 74 (9th Cir. 1980). Permitting such waiver allows the defendant, not the justice system with its attendant procedural safeguards, to determine whom the state will execute. Comer seeks death, yet the

---

[13]Because of similar concerns, the state of New Jersey has made mandatory not only direct appellate review, but also at least one round of post-conviction review. *State v. Martini*, 677 A.2d 1106 (N.J. 1996). The New Jersey Supreme Court explained its decision thus: "For those who wish to understand, we explain that under our form of government it is not the inmate on death row or the accused who determines when and whether the State shall execute a prisoner; rather, the law itself makes that determination. The public has an interest in the reliability and integrity of a death sentencing decision that transcends the preferences of individual defendants." *Id.* at 1107.

errors in his sentencing hearing prevent us from knowing if he is a member of that narrow class of individuals that the state is permitted to execute. *See Gregg*, 428 U.S. at 189. Indeed, "the waiver rule cannot be exalted to a position so lofty as to require this Court to blind itself to the real issue—the propriety of allowing the state to conduct an illegal execution of a citizen." *McKenna*, 383 A.2d at 181. We cannot abdicate our judicial and societal duty to preserve the sanctity of the Eighth Amendment from such violation. Federal appellate review of a capital defendant's federal habeas petition is a vital protection against such arbitrary and inconsistent infliction of the death penalty.

We note that limiting a defendant's ability to unilaterally waive constitutional safeguards is not without precedent. For example, the Supreme Court upheld a rule that does not allow a defendant to waive his right to a jury trial without the consent of the court and of the prosecution. *See Singer v. United States*, 380 U.S. 24, 34-35 (1965) ("The ability to waive a constitutional right does not ordinarily carry with it the right to insist upon the opposite of that right."). Nor may an accused assert a right to plead guilty to any criminal charge, and thereby waive his right to a jury trial, absent a determination of a factual basis for the plea. *See* FED. R. CRIM. P. 11(b)(3); *McCarthy v. United States*, 394 U.S. 459, 466-67 (1969). The *McCarthy* Court recognized that a defendant should not be allowed to determine whether he is convicted of a crime, by pleading guilty, if "his conduct does not actually fall within the charge." *Id.* at 467. Similarly, Comer should not be allowed to sentence himself to death if the state has not properly fulfilled its obligation to determine who falls within the narrow class of individuals who deserve capital punishment.

This Circuit has already implicitly recognized the correctness of our position. In *Landrigan v. Schriro*, we ignored the defendant's attempt to waive his pending habeas appeal. 441 F.3d 638, 653 n.2 (9th Cir. 2006) (en banc) (Bea, J., dissenting). Instead, in an en banc proceeding, we held that Landrigan may have received ineffective assistance of counsel during his sentencing hearing and remanded for an evidentiary hearing to develop the facts of the claim. *Id.* at 650.

Thus, in spite of Comer's valid waiver, we must review the merits of his habeas claims on appeal. To do otherwise, and allow Comer to be executed despite the infirmities in his sentence, would be to deny him the dignity of being treated fairly and justly by a state that claims the power of life and death over his person.

The dissent contends that review of the Eighth Amendment claim before us is foreclosed by *Gilmore v. Utah*, 429 U.S. 1012 (1976). However, the *Gilmore* Court never addressed the constitutional claim presented by the petitioner, namely whether a state must provide mandatory appellate review of a capital defendant's conviction and sentence despite the defendant's desire to waive such review. *See Gilmore*, 429 U.S. at 1017 ("The question . . . [of whether] Gilmore is 'unable' as a matter of law to waive the right to [meaningful] state appellate review . . . simply is not before us.").

In *Gilmore*, the Court's holding turned on the petitioner's lack of standing. *Id.* at 1014, 1016-17. In that case, convicted defendant Gary Mark Gilmore directed his attorneys not to appeal his conviction or sentence and to withdraw an appeal that had previously been filed without his consent, by appointed

trial counsel. *Id.* at 1015, n.4. However, four days before Gilmore's scheduled execution, his mother, Bessie Gilmore, filed an application for a stay of execution, claiming to be acting as her's son's "next friend." *Id*. at 1013. Mr. Gilmore, by and through his attorneys, then filed a response, challenging his mother's standing.

A next friend is one who appears on behalf of a party "unable, usually because of mental incompetence or inaccessibility, to seek relief [himself.]" *Whitmore*, 495 U.S. at 162 (citations omitted). A "necessary condition for 'next friend' standing in federal court is a showing by the proposed 'next friend' that the real party in interest is unable to litigate his own cause due to mental incapacity, lack of access to court, or other similar disability." *Id.* at 165. The majority in *Gilmore* held that Mr. Gilmore had "made a knowing and intelligent waiver of any and all federal rights he might have asserted," and therefore did not consider the substance of the claims his mother had raised as his next friend. *Id.*, at 1013.

*Whitmore*, 495 U.S. 149, is another case, similar to *Gilmore*, that may at first appear relevant but is actually inapposite. In *Whitmore,* Jonas Whitmore sought to challenge the validity of the sentence imposed on fellow death row inmate Ronald Simmons, who had knowingly, intelligently, and voluntarily chosen to appeal neither his conviction nor his sentence. *Id.* at 151. The Supreme Court ruled that Whitmore lacked standing, and dismissed the petition for lack of jurisdiction. *Id.* at 165-66.

Notably, neither *Gilmore* nor *Whitmore* was decided without significant dissenting opinions:

> When a capital defendant seeks to circumvent procedures necessary to ensure the

propriety of his conviction and sentence, he does not ask the State to permit him to take his own life. Rather, he invites the State to violate two of the most basic norms of a civilized society—that the State's penal authority be invoked only where necessary to serve the ends of justice, not the ends of a particular individual, and that punishment be imposed only where the State has adequate assurance that the punishment is justified. The Constitution forbids the State to accept that invitation.

*Whittmore* 495 U.S. at 173 (Marshall, J., dissenting, joined by Brennan, J.); *See Gilmore*, 429 U.S. at 1018 (White, J., dissenting, joined by Marshall and Brennan, J.) ("[T]he consent of a convicted defendant . . . does not privilege a State to impose a punishment otherwise forbidden by the Eighth Amendment.").

But the remaining Justices in both cases expressly stated that they were not reaching the issues addressed in the dissents. In *Gilmore*, 429 U.S. at 1017 (J. Stevens, concurring, joined by J. Rehnquist), Justice Stevens's concurrence described Bessie Gilmore's petition as one of a "third party [who] has no standing to litigate an Eighth Amendment claim or indeed any other claim on [the defendant's] behalf." Justice Berger stated that the question raised in Justice White's dissent was not before the Court. *Id.* at 1017 (J. Burger, concurring, joined by J. Powell).

**Volume 2 of 2**

Similarly, in *Whitmore*, 495 U.S. at 151, 155 (internal quotations and punctuation omitted), Justice Rehnquist explained:

> This case presents the question whether a third party has standing to challenge the validity of a death sentence imposed on a capital defendant who has elected to forgo his right of appeal to the State Supreme Court. . . . Our threshold inquiry into standing "in no way depends on the merits of the petitioner's contention that particular conduct is illegal," . . . and we thus put aside for now Whitmore's Eighth Amendment challenge[.]

Comer's case is different. Comer himself initiated his current appeal and properly stands before this court in his own right. Comer began the present federal habeas proceedings by filing with the District Court a preliminary petition for writ of habeas corpus, an application for appointment of counsel, and a request for a stay of execution. As a majority of this panel previously pointed out in its published opinion:

> [Comer] signed the pleading himself, in which he described the procedural history of his case and alleged that, "I am being held in violation of my federal constitutional rights." [He] specifically requested that the district court appoint Peter J. Ecker-

stom, his current counsel, and John R. Hannah, Jr., of the Law Offices of the Federal Public Defender in Arizona, to represent him. He also asked the court to both provide his attorneys with sufficient time to file an amended petition and to grant a stay of execution. In support of his request for the appointment of counsel, he signed an affidavit attesting to his indigence.

When Mr. Comer returned to state court with his federal constitutional claims, he personally verified the petition and repeated that he had given his consent to his counsel to proceed. He stated on that form that the petition contained every ground of which he was aware for granting a writ of habeas corpus. Further, he wrote that "Peter J. Eckerstrom is authorized to represent me in this matter. The pleadings he has already filed are authorized by me."

*Comer*, 215 F.3d at 912.

Comer himself filed opening and reply briefs in this Court "rais[ing] serious questions about the constitutionality of his conviction and sentence." *Comer*, 215 F.3d at 912. In contrast, Gilmore never chose to appeal. *Gilmore*, 429 U.S. at 1015, n.4. We exercised 28 U.S.C. § 2253 jurisdiction over Comer's habeas petition in 2000, and oral argument pertaining to the merits of his claims had been scheduled prior to the filing of any motion to dismiss the appeal. The State's and Habeas Counsel's briefs concerning the merits of Comer's habeas petition are today pending before this Court.

We now decide a question left unanswered by the Supreme Court: whether the Constitution permits a

state to execute a capital defendant who wants to die but whose properly filed federal habeas appeal has not yet been substantively reviewed. We answer this question in the negative.

## C. Comer's Habeas Claims

### 1. Standard of Review

Because Comer filed his federal habeas petition in 1994, the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") does not apply to his petition. *See Lindh v. Murphy*, 521 U.S. 320, 327 (1997). We therefore apply pre-AEDPA standards of review. *Woodford v. Garceau*, 538 U.S. 202, 205 (2003). Under these standards "state court judgments of conviction and sentence carry a presumption of finality and legality and may be set aside only when a state prisoner carries his burden of proving that [his] detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution." *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005) (en banc).

We review de novo the District Court's denial of habeas relief. *See Alcala v. Woodford*, 334 F.3d 862, 868 (9th Cir. 2003).

### 2. Exhaustion

#### a. Federal Standard

Consistent with our pre-AEDPA standard, habeas relief shall not be granted unless it appears that a petitioner has exhausted state remedies "or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the

prisoner." 28 U.S.C. § 2254(b) (1994). For us to pass on the merits of a constitutional claim, that claim must first have been "fairly presented to the state courts." *Picard v. Connor*, 404 U.S. 270, 275 (1971) (internal quotation marks and citation omitted); *Casey v. Moore*, 386 F.3d 896, 911 (9th Cir. 2004).

Even if a petitioner fails to raise a constitutional claim in state court, the exhaustion requirement may be satisfied, allowing us to address the claim on its merits, where the state court itself exhausts the claim. In particular, where a state court is required to review the record for federal constitutional error, the state court's determination that there was no error constitutes sufficient state consideration of a constitutional claim, which impliedly exhausts that claim in a way that is not independent of federal law. *See Ake v. Oklahoma*, 470 U.S. 68, 74-75 (1985); *Beam v. Paskett*, 3 F.3d 1301, 1306-07 (9th Cir. 1993), *overruled on other grounds by Lambright v. Stewart,* 191 F.3d 1181, 1185 (9th Cir. 1999). A state court's automatic review process does not necessarily exhaust all federal constitutional claims. *See Poland v. Stewart*, 117 F.3d 1094, 1105-06 (9th Cir. 1997) (distinguishing Arizona's fundamental error review provision as not providing implied exhaustion of otherwise precluded constitutional claims). Rather, only those claims that the state court is specifically required to review are exhausted on the merits by that review. *Id.* at 1106.

In *Beam*, we construed the Idaho Supreme Court's automatic review of death sentences as impliedly exhausting constitutional claims not raised by the capital defendant on direct appeal in state court. 3 F.3d at 1306-07.[14] Because the Idaho Supreme Court

---

[14]The State contends that the Court's decision in *Teague v. Lane*, 489 U.S. 288 (1989), bars retroactive application of *Beam* to Comer's case.

"ha[d] an affirmative duty to review the entire record
in a capital case to determine . . . whether 'the sen-
tence of death was imposed under the influence of
passion, prejudice, or any other arbitrary factor[,]'
[t]he state court must [have] consider[ed] possible
errors in sentencing that [were] not raised by the
defendant." *Id.* (internal citation omitted). The Idaho
Supreme Court's decision to affirm Beam's death
sentence necessarily included an "antecedent deter-
mination of federal law." *Id.* at 1307. Thus, Beam's
challenge to the constitutionality of the use of an
aggravating factor during sentencing was not proce-
durally defaulted. *Id.*

### b.    Arizona Supreme Court's Independent Review of Capital Cases

As in *Beam*, we look both to Arizona's statutes
and its case law to determine the parameters of Ari-
zona's independent review of capital cases. "In capi-
tal cases, [the Arizona Supreme Court]
independently examine[s] the record to determine
the existence of aggravating and mitigating circum-
stances *and* the propriety of imposing the death pen-
alty." *Comer*, 799 P.2d at 348 (Ariz. 1990)
(emphasis added). This independent review specifi-
cally encompasses review of the sentencing hearing
and record as well as aggravating and mitigating cir-
cumstances to ensure, among other things, that
"proper procedures were followed." *State v. Hill*,
848 P.2d 1375, 1388 (Ariz. 1993) (citation omitted)
(reviewing whether the sentencing judge had an
impermissible conflict that required his recusal, as

---

We have held, however, that *Teague* does not apply to matters of federal
habeas jurisdiction, including our exhaustion analysis. *Coe v. Thurman*,
922 F.2d 528, 533-34 (9th Cir. 1991).

well as aggravating and mitigating circumstances); *accord State v. Stuard,* 863 P.2d 881, 896-97 (Ariz. 1993) (undertaking a "painstaking" examination of the record to determine if the death penalty was erroneously imposed); *State v. Bible*, 858 P.2d 1152, 1206 (Ariz. 1993); *see also State v. Watson*, 628 P.2d 943, 946 (Ariz. 1981) (noting that the Arizona Supreme Court painstakingly reviews death sentences to ensure the punishment is not inflicted in an arbitrary and capricious manner). The Arizona Supreme Court also ensures that the death penalty was not "imposed under the influence of passion, prejudice, or any other arbitrary factors." *State v. Richmond*, 560 P.2d 41, 51 (Ariz. 1977), *overruled on other grounds by State v. Salazar*, 844 P.2d 566 (Ariz. 1992); *accord State v. Woratzeck*, 657 P.2d 865, 871 (Ariz. 1982). This independent review process includes scrutiny of federal constitutional claims. *State v. Brewer*, 826 P.2d 783, 790-91 (1992) (undertaking independent review because, among other matters, the Arizona Supreme Court must determine that under the Eighth and Fourteenth Amendments the death penalty is not being inflicted in an arbitrary and capricious fashion). As the Arizona Supreme Court noted in explaining its review, "[i]f the record reveals that the trial court, *for whatever reason*, improperly sentenced a defendant to death, we must overturn that sentence." *Id*. at 791 (emphasis added).[15]

    c.  Comer's Impliedly Exhausted Habeas
    Claims

---

[15]We have recognized the thoroughness of the Arizona Supreme Court's independent review process in another context. *See Gerlaugh v. Stewart*, 129 F.3d 1027, 1045 (9th Cir. 1997) (finding that Arizona's independent review as to the "propriety and legality of the death penalty" justifies counsel's tactical decision to rely on that review instead of independently raising claims related to defendant's sentencing).

The District Court found seven of Comer's present habeas claims to be procedurally defaulted because Comer failed to raise them in state court.[16] As explained below, however, under the Arizona Supreme Court's independent review process, four of these seven claims were impliedly exhausted; therefore, we may address the merits of those claims.

The preceding discussion makes clear that during its independent review, the Arizona Supreme Court examines the entire record, particularly the sentencing hearing, to determine if any procedural errors occurred or other arbitrary factors influenced the sentencing court's decision to impose the death sentence. The Arizona Supreme Court is clearly conscious of its duty to respect the dictates of the Eighth and Fourteenth Amendments and to ensure that the death penalty is not imposed in an arbitrary and capricious fashion.

Four of the claims Comer initially presented to the District Court (Claims VIII, IX, X, and XI) relate to the procedural conduct of his sentencing hearing, and directly implicate Eighth and Fourteenth Amendment protections against the arbitrary imposition of the death penalty. These claims were also readily apparent from the record that the Arizona

---

[16]Specifically, those claims include: (1) the unconstitutionality of the trial court's failure to follow a statutorily required procedure at a post-competency hearing (Claim VIII), (2) the unconstitutionality of the trial court's conducting a post-competency hearing in Comer's absence (Claim IX), (3) the unconstitutionality of the trial court's sentencing Comer while unclothed and semi-conscious (Claims X and XI), (4) the insufficiency of evidence to support the court's finding that Comer committed the homicide for pecuniary gain (Claim XII), (5) the Arizona Supreme Court's failure to consider the cumulative weight of Comer's mitigation evidence (Claim XIV), and (6) the Arizona death penalty statute's failure to narrow the class of defendants subject to the death penalty (Claim XVI).

Supreme Court painstakingly reviewed. *Cf. Falcone v. Stewart*, 120 F.3d 1082, 1084 n.2 (9th Cir. 1997) (constitutional claims that are "readily apparent from the record" fall under the penumbra of the automatic review process), *vacated on other grounds*, 524 U.S. 947 (1998). Therefore, we hold that they were impliedly exhausted, on their merits, by Arizona's independent review of Comer's capital case. We examine the implied exhaustion of each of these penalty-phase claims in turn.

First, Comer claims that the trial court violated his Fifth, Sixth, and Fourteenth Amendment rights by not determining his competency during the sentencing hearing, and not following a statutorily required procedure at a post-sentence competency hearing (Claim VIII). Comer's compromised physical and mental condition during sentencing is readily apparent from the record that was presented to the Arizona Supreme Court. That record included a transcript of the sentencing hearing, which begins with the very question of whether Comer is even conscious. This question arose because Comer was presented to the court nearly naked, shackled to a wheelchair, with his head slumped to the side, and bleeding from a head wound. A videotape of the sentencing, demonstrating Comer's condition, was also before the Arizona Supreme Court. Furthermore, the record included a transcript of the post-sentencing competency hearing, held the next day, in which Comer's competency during sentencing was explicitly discussed. These transcripts and videotape gave ample notice to the Arizona Supreme Court that Comer's competency was of concern during the sentencing hearing. Additionally, to sentence a defendant while he is incompetent is a federal due process violation. *See Sailer v. Gunn*, 548 F.2d 271, 273-74 (9th Cir. 1977); *see also Pate v. Robinson*, 383 U.S. 375, 378

(1966); *Drope v. Missouri*, 420 U.S. 162, 172 (1975). The Arizona Supreme Court's decision not to address this constitutional issue during its independent review was an implicit rejection of any error.

Second, Comer claims that the conduct of the post-sentence competency hearing in his absence violated his Sixth, Eighth, and Fourteenth Amendment rights (Claim IX). Again, Comer's absence from the post-sentence hearing is readily apparent from the transcripts. A defendant has a constitutional right to be present at any critical stage of his prosecution, including at capital sentencing hearings, *see Gardner v. Florida,* 430 U.S. 349 (1977), and hearings to determine the defendant's competency, *see Sturgis v. Goldsmith*, 796 F.2d 1103, 1108 (9th Cir. 1986). Thus, by failing to address this issue, the Arizona Court again impliedly rejected any error.

Third, Comer claims his sentencing while unclothed and semi-conscious violated the due process clause of the Fourteenth Amendment (Claims X and XI). The egregious circumstances of Comer's condition during sentencing are readily apparent from both the trial transcript and the videotape presented to the Arizona Supreme Court. By not commenting on this issue, the Arizona Court implicitly signaled its rejection of any error.

We hold, therefore, that these four claims were exhausted on their merits by the Arizona Supreme Court's independent review of Comer's capital case. Comer's three other claims (Claims XII, XIV, and XVI) are neither as readily apparent from the record nor as clearly encompassed within Arizona's independent review. Thus, we do not find them to be impliedly exhausted. We may proceed to decide the

merits of Comer's impliedly exhausted claims without remand to the District Court. *See Beam*, 966 F.2d at 1570-75; *Granberry v. Greer*, 481 U.S. 129, 131 (1987) (noting that a federal appellate court may appropriately decide the merits of a habeas petition).

Additionally, Comer argues that Arizona's fundamental error review exhausted most of the other claims he presented to the District Court. We have held, however, that we will only consider a claim to be exhausted by Arizona's fundamental error review if it was explicitly noted in the briefs presented to the state appellate court, or the state court mentions it is considering the claim *sua sponte*. *See Moormann v. Schriro*, 426 F.3d 1044, 1057 (9th Cir. 2005). Because neither occurred in this case, we affirm the District Court's finding that most of Comer's other habeas claims were procedurally defaulted.

We now proceed to address on the merits Comer's impliedly exhausted and actually exhausted claims. First, we will consider the four guilt-phase claims that Comer raises in his appeal brief and that the District Court found were actually exhausted and thus not procedurally defaulted. Second, we will address Comer's penalty phase claims, which include an actually exhausted claim of ineffective assistance of counsel and the four impliedly exhausted claims we have discussed in this section.

### 3. *Guilt-Phase Claims*

Comer contends that his conviction should be set aside because of several constitutional errors that occurred during the guilt phase of his trial. Specifically, Comer claims that: (1) the trial court's failure to sever the Pritchard homicide count from the Andrews and Brough kidnapping/robbery/sexual

assault counts violated his due process right to a fair trial; (2) the trial court's failure to sever the counts also violated his constitutional right to testify; (3) the prosecutor's misconduct during closing argument deprived Comer of a fundamentally fair trial; and (4) the trial court's failure to strike two venirepersons for cause denied Comer his Sixth Amendment right to a fair and impartial jury.

The District Court considered the merits of all four of these claims and denied Comer's habeas petition. We agree with the District Court that Comer is not entitled to relief based upon any of these claims; therefore, his conviction should stand and we deny his habeas petition as to these guilt-phase claims.

### a.  *Severance*

#### i.  Due Process

Comer's first claim is that the trial court improperly joined the Pritchard homicide count to the Andrews and Brough kidnapping/robbery/sexual assault counts. Comer contends that, because the evidence with regard to the Andrews and Brough counts was stronger and more inflammatory than the evidence relating to the first-degree murder count, he was prejudiced by the joinder of the offenses since the inflammatory evidence had a substantial and injurious impact on the jury's determination regarding the first-degree murder count.

"[T]he propriety of consolidation rests within the sound discretion of the state trial judge." *Fields v. Woodford*, 309 F.3d 1095, 1110 (9th Cir. 2002). Thus, we will not grant habeas relief unless the joinder "actually render[ed] petitioner's state trial fundamentally unfair and hence, violative of due process."

*Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004) (citation omitted); *Bean v. Calderon*, 163 F.3d 1073, 1084 (9th Cir. 1998). "The requisite level of prejudice is reached only if the impermissible joinder had a substantial and injurious effect or influence in determining the jury's verdict." *Davis*, 384 F.3d at 638 (internal quotation marks and citation omitted). We conclude that the joinder of the homicide and kidnapping/robbery/sexual assault counts did not render Comer's trial fundamentally unfair.

Comer contends that the circumstances of his trial are analogous to those found in *Bean v. Calderon*, a case in which we held that the joinder of two murder counts prejudiced the defendant as to one of the counts. 163 F.3d at 1083-86. The likelihood of prejudice in *Bean*, however, was much greater than the likelihood that Comer was prejudiced by the joinder of the homicide and kidnapping/robbery/sexual assault counts.

First, in *Bean*, we found that the evidence regarding the separate murder counts at issue would not have been cross-admissible had the counts been tried separately. 163 F.3d at 1084. In contrast, the Arizona Supreme Court held that the homicide and kidnapping/robbery/sexual assault counts were properly joined because evidence pertaining to both sets of offenses demonstrated that Comer was engaged in a common scheme or plan to obtain money and supplies. *Comer*, 799 P.2d at 338-39 (Ariz. 1990). Thus, as Comer acknowledges, at least some of the evidence presented at his trial was admissible as to all of the counts. This cross-admissibility of evidence significantly reduces the potential prejudice to Comer. *See, e.g.*, *Davis*, 384 F.3d at 638-39 (finding no prejudice to the defendant when evidence was cross-admissible, the weight of evidence for each

count was roughly equivalent, and the court gave a limiting instruction); *cf. Leach v. Kolb*, 911 F.2d 1249, 1258-60 (7th Cir. 1990) (holding that, even when counts were not properly joined under state law, the misjoinder was not prejudicial due to a limiting instruction and strong evidence of guilt as to each charge).

Second, the improperly joined counts in *Bean* consisted of two murders. 163 F.3d at 1083. However, when the joined offenses are different in nature, such as murder and kidnapping/sexual assault, and specific evidence is presented as to each crime, the risk of confusing or misleading the jury is reduced. *See United States v. Irvine*, 756 F.2d 708, 712-13 (9th Cir. 1985).

Third, the jury in *Bean* received only a very general instruction that each count must be decided separately. 163 F.3d at 1083. In contrast, Comer's jury was explicitly instructed "to give separate consideration to each individual count" and to "analyze what the evidence in each count shows with respect to that individual count." While this instruction may not have been ideal, since the court subsequently instructed that jury that some evidence might overlap between the counts, it still acted to limit any prejudice. *See Davis*, 384 F.3d at 639 ("[A]ny prejudice was further limited through an instruction directing the jury to consider each count separately.").

Finally, the evidence relating to Comer's guilt of the Pritchard homicide count was strong, as was the evidence of the kidnapping/robbery/sexual assault counts. In *Bean*, the prosecution was able to muster only scant evidence to convict Bean of the second murder count, including a disputed fingerprint, a matching hair, and testimony of a neighbor who saw

Bean hiding in some bushes across from the victim's house several weeks before the crime took place. 163 F.3d at 1085. Here, in contrast, during closing argument Comer's counsel admitted that Comer shot Pritchard. Comer's defense was that the shooting was an accident precipitated by Comer's intoxication at the time, and thus did not involve the premeditation necessary for a finding of first degree murder. The prosecution presented substantial evidence to rebut this theory, including: (1) the location of the wound, behind the ear, which suggested a deliberate shooting; (2) testimony of Willis that, moments before the shooting, Comer told her, "I'm going to blow him away," and that after the shooting Comer said "[s]ee what I've done, I'm a cold and callous killer"; and (3) evidence that Comer stabbed Pritchard in the throat after the shooting. Comer counters that Willis's testimony cannot be believed. When faced with this argument in *Sandoval v. Calderon*, however, we held that the issue of a witness's credibility is for the jury to decide. 241 F.3d 765, 772-73 (9th Cir. 2000). The jury's conviction of Comer on the first degree murder count suggests it credited Willis's testimony. Additionally, all parties agree that the evidence as to Comer's guilt with regard to the kidnapping/robbery/sexual assault counts was overwhelming.

Given the strength of the evidence against Comer on all counts, the cross-admissibility of that evidence, and the trial court's limiting instruction, we hold that Comer's trial was not rendered fundamentally unfair by joinder of the counts. *See, e.g.*, *Davis*, 384 F.3d at 638-39 (holding no prejudice to defendant when evidence was cross-admissible, weight of evidence for each count was roughly equivalent, and court gave a limiting instruction); *Fields*, 309 F.3d at 1109-1110 (holding no prejudice to defendant when

evidence was cross-admissible and evidence of guilt as to all counts was strong); *Sandoval*, 241 F.3d at 771-73 (same).

### ii.    Right to Testify

In a related claim, Comer contends that his right to testify under the Fifth, Sixth, and Fourteenth Amendments was violated when the trial court refused to sever the Pritchard homicide count from the Andrews and Brough counts.

Comer is correct in asserting that he has a due process right to testify in his own defense. *See Rock v. Arkansas*, 483 U.S. 44 (1987). The right to testify, however, does not guarantee a defendant's ability to testify only to information favorable to his defense. *Rock*, 483 U.S. at 52 (a defendant who chooses to testify is subject to cross-examination); *United States v. Alosa*, 14 F.3d 693, 696 (1st Cir. 1994) (noting that the Fifth Amendment protects a defendant's right to choose whether to testify, but "does not assure that the testimony will only benefit the defendant"). A defendant, therefore, retains the ability to decide strategically whether to testify and thus revealing damaging information. *See Rock*, 483 U.S. at 53.

However, joinder of counts may unduly affect a defendant's choice whether to testify. *See, e.g.*, *United States v. Balzano*, 916 F.2d 1273, 1283 (7th Cir. 1990). To obtain severance because of this prejudicial effect, a defendant "must show that he has important testimony to give on some counts and a strong need to refrain from testifying on those he wants severed." *See United States v. Nolan*, 700 F.2d 479, 483 (9th Cir. 1983). Applying *Nolan* to this case, we hold that Comer was not entitled to sever-

ance based on his Fifth, Sixth, and Fourteenth Amendment right to testify.

Comer claims that, had the counts not been joined, he would have testified to the circumstances surrounding his shooting of Pritchard. Because he did not wish to testify regarding the Andrews and Brough counts, however, he refrained from taking the stand, or even attending the trial, because his motion for severance was not granted. In support of his motion for severance, a defendant must specifically identify the testimony he would offer in his defense so that the trial court can determine if that testimony is important enough to justify severance. *See United States v. Fenton*, 367 F.3d 14, 22 (1st Cir. 2004) (holding that a bald assertion of innocence and unparticularized claim as to witness credibility was not specific enough to mandate severance); *United States v. Alexander*, 135 F.3d 470, 477 (7th Cir. 1998) (requiring specific examples of the exculpatory testimony the defendant would give). Before the trial court, Comer's counsel asserted that Comer would testify that the shooting was unintentional and give details of the surrounding circumstances. Comer would also have refuted Willis's testimony by denying that he ever made the statements "I'm going to blow him away" and "I'm a cold, callous killer." Without additional details regarding the circumstances Comer would have testified to, we find this proffered testimony is not specific enough to mandate severance.

Additionally, Comer did not have a strong need to refrain from testifying as to the Jones and Smith counts. "[A] defendant fails to make a convincing demonstration of a strong need to refrain from testifying on particular counts when[,] [w]ithout [the defendant's] testimony, the government offered suf-

ficient evidence to support the jury's verdict on these counts." *Balzano*, 916 F.2d at 1283 (internal quotation marks omitted); *accord United States v. Freeland*, 141 F.3d 1223, 1227 (7th Cir. 1998). As discussed in the previous section, all parties agree that the evidence with regard to the Jones and Smith counts, which included the eyewitness testimony of Jones, Smith, Willis, and Willis's daughter, was overwhelming. Thus, Comer lacked a strong need to refrain from testifying to these counts.

For these reasons, the trial court did not violate Comer's Fifth, Sixth, and Fourteenth Amendment rights by refusing to sever the Pritchard count from the Jones and Smith counts.

### b.  *Prosecutorial Misconduct*

Comer's next claim is that the prosecutor engaged in misconduct that violated Comer's Fourteenth Amendment due process rights by rendering his trial fundamentally unfair. In particular, Comer takes issue with the prosecutor's use of dehumanizing epithets during closing argument. Comer claims the remarks were both improper and impermissibly appealed to the passion and prejudice of the jury.

As all of the other courts before us have done, we condemn the prosecutor's remarks. At various times throughout closing argument, the prosecutor repeatedly referred to Comer as a "monster" and "filth," analogized his crimes to a horror movie, and once called Comer a "reincarnation of the devil." We also agree with the other courts, however, that the prosecutor's remarks did not render Comer's trial fundamentally unfair. "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 477

U.S. 168, 181 (1986) (internal quotation marks omitted). Rather, we must decide "whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (internal quotation marks omitted). "[T]he appropriate standard of review for such a claim on writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power." *Id.* (internal quotation marks omitted); *accord Duckett v. Godinez*, 67 F.3d 734, 743 (9th Cir. 1995).

First, we address Comer's claim that the prosecutor's dehumanizing epithets rendered his trial fundamentally unfair. The prosecutor's remarks regarding Comer are similar to those uttered by the prosecutors in *Darden*. There, the prosecutors called the defendant an "animal" and asserted that he should be kept on a leash. 477 U.S. at 180 n.11 & n.12. The prosecutors also expressed their wish that Darden's face had been blown off during his crimes, and argued that Darden deserved the death penalty to prevent him from ever terrorizing the public again. *Id.* at 180 n.10 & n.12. Both Darden's prosecutors and Comer's prosecutor dehumanized their respective defendants with these remarks.

Nonetheless, in *Darden*, the Supreme Court held that the prosecutors' remarks did not deny the defendant a fundamentally fair trial for several reasons, including: the prosecutor did not manipulate or misstate any evidence; many of the remarks were responsive to comments made by the defense; the trial court instructed the jurors that their decision "was to be made on the basis of the evidence alone" and "the arguments of counsel were not evidence"; strong evidence of the defendant's guilt had been presented during the trial; and defense counsel

turned many of the prosecutors' remarks against them in defense counsel's rebuttal. *Id.* at 181-82.

Similarly, Comer's prosecutor did not misstate or manipulate any evidence in making his objectionable remarks. The trial court also instructed the jurors that their decision was to be based only on the evidence produced in court, with evidence defined as witness testimony and exhibits. The jurors were specifically admonished that the lawyers' statements during opening and closing argument were not evidence. Furthermore, they were instructed not to be "influenced by sympathy or prejudice." And during his closing statement, the prosecutor warned the jurors that his statements, and those of defense counsel, were not "proof." These admonishments and instructions significantly limited any prejudice caused by the prosecutor's remarks. *See, e.g.*, *Furman v. Wood*, 190 F.3d 1002, 1006 (9th Cir. 1999) (upholding the state court's ruling that the prosecutor's improper statements did not render trial fundamentally unfair because the prosecutor also told the jury that his arguments were not evidence, and because the government presented a strong case against the defendant); *Hall v. Whitley*, 935 F.2d 164, 165-66 (9th Cir. 1991) (holding that the prosecutor's improper comments were isolated moments in a three day trial, and their effect was mitigated by the judge's instructions that closing arguments were not evidence, and the strong proof of the defendant's guilt).

Additionally, as discussed earlier, there was strong evidence of Comer's guilt. Comer claims that the prosecutor's remarks were intended to induce the jury to find that he had premeditated an intent to shoot Pritchard. However, the prosecutor only once referred to Comer as a "monster" when discussing the murder count. All of the prosecutor's other

objectionable remarks were made during his discussion of the Andrews and Brough counts, on which there was overwhelming evidence of Comer's guilt. There was also strong evidence, including eyewitness testimony, regarding Comer's premeditation. Finally, any emotional impact that the prosecutor's statements may have had on the jury likely only replicated the impact of earlier eyewitness testimony from the victims and Willis. *See Fields v. Woodford*, 309 F.3d at 1109 ("[G]iven the eyewitness testimony about what [the defendant] did to [the victim], there is no reasonable probability that the prosecutor's emotional appeal affected the verdict.").

Accordingly, we hold that while the prosecutor's remarks were improper, they do not rise to the level of a due process violation. *See Hall*, 935 F.2d at 165-66; *Kellogg v. Skon*, 176 F.3d 447, 451-52 (8th Cir. 1999) (holding that the prosecutor's improper remarks, including calling the defendant a "monster," "sexual deviant," and "liar," did not rise to the level of a due process violation because of limiting jury instructions, no attempt on the part of the prosecutor to manipulate or misstate the evidence, and heavy evidence of guilt).

Additionally, we reject Comer's contention that these remarks were an impermissible appeal to the passion and prejudice of the jury. Comer cites *Northern Mariana Islands v. Mendiola* for the proposition that comments "designed to appeal to the passions, fears, and vulnerabilities of the jury" may constitute grounds for reversal. 976 F.2d 475, 486-487 (9th Cir. 1992), *overruled on other grounds by George v. Camacho*, 119 F.3d 1393 (9th Cir. 1997). In *Mendiola*, however, "we emphasized . . . that the comment was prejudicial only in view of the weakness of the prosecution's case, the prosecutor's disingenu-

ity as to the whereabouts of the missing weapon, and the Government's resort to coercion to obtain evidence." *United States v. Hinton*, 31 F.3d 817, 825 (9th Cir. 1994) (explaining our holding in *Mendiola*). Because none of these factors are present here, we hold that the prosecutor's remarks did not render Comer's trial fundamentally unfair.

### c.   *Refusal to Strike Venirepersons*

Comer's fourth guilt-phase claim is that the trial court's failure to strike for cause two venirepersons denied Comer his right to a fair and impartial jury as required by the Sixth and Fourteenth Amendments. Comer contends that two of the venirepersons questioned during jury selection, Thrailkill and Wilborn, were biased because of their previous knowledge of some of the facts of the case and, therefore, should have been dismissed for cause. When the trial court refused to strike the two potential jurors, Comer's counsel used two of his preemptory challenges to remove them from the jury. Even if the trial court erred in failing to strike the two venirepersons in question, such error does not constitute an unconstitutional denial of a fair and impartial jury unless the venirepersons sit on the jury. *United States v. Martinez-Salazar*, 528 U.S. 304 (2000). Because Thrailkill and Wilborn were not members of Comer's jury, he suffered no constitutional harm.

### d.   *Conclusion*

For the foregoing reasons, we affirm the District Court's denial of Comer's habeas petition as to his guilt-phase claims.

### 4.   *Penalty-Phase Claims*

Pursuant to our holding that several of Comer's penalty-phase claims were impliedly exhausted by Arizona's independent review of Comer's capital case, we have before us five claims of error from Comer's sentencing hearing. Comer contends that: (1) his sentencing counsel rendered ineffective assistance; (2) he was constitutionally entitled to a hearing to determine his competency at the time of sentencing; (3) the conduct of a post-sentence competency hearing in his absence violated his Sixth, Eighth, and Fourteenth Amendment rights; (4) sentencing him while unclothed and semi-conscious impaired his right to allocution; and (5) sentencing him for a capital crime while unclothed violated the Fourteenth Amendment.

As to Comer's fifth claim, we hold that his Fourteenth Amendment due process rights were violated by the circumstances under which he was presented to the sentencing court. Because we grant his writ of habeas corpus on this basis, we do not address Comer's other sentencing-phase claims.

### a. *Comer's Treatment During Sentencing*

Comer contends that his due process rights under the Fourteenth Amendment were violated when he was sentenced to death while nearly naked and barely conscious. While this is an issue of first impression for this Court, we agree with Comer that his treatment during sentencing "shocks the conscience" and warrants reversal of his sentence.

"Regard for the requirements of the Due Process Clause 'inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings (resulting in a conviction) in order to

ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses.' " *Rochin v. California*, 342 U.S. 165, 169 (1952) (citation omitted). Conduct of state officials that "shocks the conscience" will not be tolerated. *Id*. at 172.

Subsequent decisions have given content to this broad protection. In particular, numerous courts have found that the routine and unjustified shackling of a defendant, at any stage of trial proceedings, violates due process. *See Deck v. Missouri*, 544 U.S. 622 (2005) (holding that the visible shackling of a defendant before a jury during the guilt phase or penalty phase of a capital trial violates due process absent case-specific security justifications for the shackling); *United States v. Howard*, 429 F.3d 843 (9th Cir. 2005) (holding that the shackling of pretrial detainees during their first appearance before a magistrate judge violates due process unless reasonably related to a legitimate goal); *Duckett,* 67 F.3d at 746-50 (holding that the shackling of a defendant during the penalty phase of a capital trial is inherently prejudicial and may only occur if compelling circumstances justify the need for shackling to maintain order in the courtroom).

Five basic considerations have led courts to conclude that unjustified shackling is a due process violation. First, shackling suggests to the trier of fact that the defendant is dangerous, which adversely and impermissibly affects perception of the defendant in a way that undermines the trier's "ability to weigh accurately all relevant considerations — considerations that are often unquantifiable and elusive — when it determines whether a defendant deserves death." *Deck*, 544 U.S. at 633; *see also Duckett*, 67

F.3d at 748. Thus, "shackles can be a thumb [on] death's side of the scale." *Deck*, 544 U.S. at 633 (internal quotations omitted).

Second, shackling is an affront to the very "dignity and decorum of judicial proceedings." *Id.* at 631-32; *Howard*, 429 F.3d at 851; *Duckett*, 67 F.3d at 747-48. As the Supreme Court explained, "[t]he courtroom's formal dignity, which includes the respectful treatment of defendants, reflects the importance of the matter at issue, . . . and the gravity with which Americans consider any deprivation of an individual's liberty through criminal punishment." *Deck*, 544 U.S. at 631. Depriving a courtroom of such dignity undermines public confidence in judicial proceedings. *Id.*

Third, shackles greatly reduce a defendant's ability to communicate with counsel and participate in his own defense. *Id.* at 631; *see also Howard*, 429 F.3d at 851; *Duckett*, 67 F.3d at 747-48. Fourth, and related to the third concern, physical restraints may also confuse and embarrass the defendant, impairing his mental faculties. *Howard*, 429 F.3d at 851; *Duckett*, 67 F.3d at 747-48. And fifth, shackles may cause the defendant physical and emotional pain. *Id.* For these reasons, we and the Supreme Court have concluded that unjustified shackling substantially interferes with a defendant's right to a fair and decent trial and sentencing proceeding.

The foregoing reasons apply with even greater force to the circumstances of Comer's sentencing. Comer was presented to the sentencing court not only in shackles, but nearly naked, with only a blanket covering his genitals, and slumped to one side in a wheelchair with blood oozing from his head wounds. His lack of clothing revealed to the court

and the public his numerous and graphic tattoos, which cover most of his body. And the responses he mustered to the court's questions were cursory at best.

This presentation of Comer — shackled, beaten, and tattooed — certainly increased the perception of his dangerousness. If Comer had been sentenced before a jury, these circumstances would have given rise to insurmountable prejudice. *See Deck*, 544 U.S. at 633. Because Comer was sentenced by a judge, however, this Circuit has concluded that the risk of prejudice is lessened. *See Howard*, 429 F.3d at 850. Nonetheless, when a judge is asked to decide whether a defendant deserves to live or die, the judge, like any jury, must weigh those considerations that are "often unquantifiable and elusive." *Deck*, 544 U.S. at 633. It is hard to believe that any human being, no matter how well-trained to be impartial, would be entirely unaffected by the dehumanizing impact of Comer's appearance in the courtroom.

This dehumanizing effect was compounded by the fact that the final sentencing hearing was one of the few times Comer had appeared before the judge. Comer did not attend the pre-sentencing hearing at which aggravating and mitigating evidence was presented. He only appeared briefly before the court at the beginning of the guilt phase of his trial, then waived his presence for the rest of the proceeding. Thus, Comer's presence before the court during his final sentencing hearing was one of the few times the judge had to confront the individual over whom he held the power of life and death. Yet the circumstances of this meeting, far from humanizing Comer, deprived him of his dignity.

Furthermore, the appearance of this naked, bleeding, shackled man was a severe affront to the dignity

and decorum of the judicial proceedings. We have never before read of a man being sentenced to death, or even presented to a court, under such circumstances. Even inmates in solitary confinement have a dignitary interest in being clothed. *See, e.g., Maxwell v. Mason*, 668 F.2d 361, 363, 365 (8th Cir. 1981). If the court's formal dignity is a reflection of the importance of the matter at issue, *Deck*, 544 U.S. at 631, then preservation of that dignity is most important when deciding whether a man lives or dies. The sentencing of Comer without such dignity or decorum is unacceptable.

Comer's condition during sentencing also diminished his ability to communicate with his counsel. Not only were his hands bound, but as the jail psychiatrist later testified, Comer was exhausted, which had an unquantified effect on his mental processes. And just as shackles may confuse and embarrass a defendant, so too certainly does being wheeled into a courtroom while nearly naked and exhausted. Finally, with respect to the fifth consideration, Comer suffered physical pain from his visible lacerations.

As the foregoing demonstrates, the due process considerations that militate against the routine use of shackles during the trial and sentencing of defendants apply with even greater force to the circumstances under which Comer was sentenced. If those circumstances had been different — if Comer had been handcuffed, yet fully clothed and physically inviolate, when he attended the sentencing — then we would need to inquire further into the reasons for Comer's condition because even shackling may be justified by special circumstances such as security concerns. *Deck*, 544 U.S. at 633; *Howard*, 429 F.3d at 851. We cannot conceive of any reasonable justifi-

cation, however, for escorting a *naked and bleeding* defendant into a courtroom for a capital sentencing hearing. We hold that Comer's due process rights were violated when he was sentenced while shackled, nearly naked, bleeding, and exhausted.

Additionally, the circumstances of Comer's sentencing were so inherently prejudicial and their impact so difficult to divine from the trial transcript, that, as in the shackling cases, Comer "need not demonstrate actual prejudice to make out a due process violation." *Deck*, 544 U.S. at 635. When life and death are at stake, subjective considerations such as the humanity and dignity of a defendant will always influence the sentencing decision, whether it is made by judge or jury. The effect of Comer's diminished ability to communicate with his counsel, and the mental impact of his nakedness, exhaustion, and shackling, are also difficult to measure. Thus, we cannot find beyond a reasonable doubt that the circumstances of Comer's sentencing did not contribute to the sentence he received. For these reasons, Comer is entitled to a new sentencing hearing.

## III.   CONCLUSION

We affirm the District Court's denial of Comer's habeas corpus petition as to the guilt phase of his trial. We reverse the District Court's denial of his writ of habeas corpus as to the penalty phase and remand with instructions to grant the writ as to the sentence unless Arizona begins resentencing proceedings within a reasonable amount of time to be determined by the District Court.

**AFFIRMED in part; REVERSED in part and REMANDED.**

Nothing in this opinion requires the Arizona court to conduct a new penalty phase. The due process violation occurred *after* the guilt phase of the trial. The due process violation occurred *after* the penalty phase of the trial. The due process violation occurred at the sentencing hearing held by the Arizona trial judge who imposed the penalty of death on a man who was naked, bleeding, shackled, exhausted and semiconscious.

Comer wants to die. Arizona wants to execute him. There is little question that this will happen. Judge Ferguson's opinion only requires that the sentence of death be pronounced to an understanding human, not to a discarded piece of flesh.

